United States District Court
Eastern District of New York

1:19-cv-00249

Ronnie Elliott individually and on behalf of all others similarly situated

                Plaintiff

- against -

Complaint

Food For Life Baking Co., Inc.

                Defendant

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Food For Life Baking Co., Inc.("defendant") manufactures, markets and distributes breakfast cereal products (the "Products") under the brand, "Ezekiel 4:9," sold to consumers by third-parties from brick-and-mortar stores and online.

2. The Products are available in no fewer than nine varieties in boxes of 16 oz. (454g): Almond Flake, Almond Sprouted Whole Grain, Cinnamon Raisin Whole Grain, Flax & Chia Sprouted Flake, Flax Sprouted Whole Grain, Original Flake, Raisin Flake and Original Sprouted Whole Grain and

3. The common front label representations include "Ezekiel 4:9" "Sprouted Grain Crunchy Cereal" "The Live Grain Difference" text corresponding to Chapter 4, Section 9, of the Book of Ezekiel in the Old Testament, "*As described in the Holy Scriptures*: Take also unto thee *Wheat* and *Barley* and *Beans* and *Lentils* and *Millet* and *Spelt* and put them in one vessel and made bread of it."

1



4. The back of the box representations are presented under the heading, "The Live Grain DIFFERENCE" and states the Products "are made from sprouted organic live grains, legumes, and seeds, and *contain absolutely no flour*."

5. The back of the box declares that "Sprouting is the only way to release all of the vital nutrients stored in whole grains," and that their process "unlock[s] [in the grains] dormant food energy and maximize nutrition and flavor."

6. The result is that "Beneficial enzymes are activated which cause the grains to sprout and become a living food," which "increases valuable nutrients and also causes a natural change

2

that promotes a more efficient assimilation of protein and carbohydrates" (bioavailable).

7. These properties of the sprouted grains, the Products declare "You can see, taste, and smell the live grain difference," "Your body and taste buds will know the difference."

<u>Back of the Box</u>



8. Cereals, grains, pseudocereals, and pulses are important components of most diets, providing good sources of energy, as well as macro- and micronutrients.

9. Studies have shown that consumers are seeking out more foods which have been

3

processed using natural methods, such as fermentation and germination ("sprouting").

10. Sprouting refers to what happens to a grain or seed when it is soaked in water – its metabolic activity increases and its composition changes due to mobilizing its energy, or storage materials.

11. This is seen through the "sprout" or radicle, that emerges and becomes visible.

Non-Sprouted Wheat             Sprouted Wheat



12. The representations that sprouted grains contain more "vital nutrients" are implied references to protein and fiber, and claim to supply more nutritive value than non-sprouted counterparts.[1]

13. During the sprouting process, the seed is utilizing its energy resources – carbohydrates and fat – resulting in a *decrease* in dry matter (carbohydrates).

14. This means that when nutrients and minerals are measured after sprouting, there will

---

[1] Nielson, M. T., et al. "Improvement of wheat protein quality by germination" several kinds of wheat sprouted at different temperatures and after 10 days, the seedlings were well developed and total nitrogen increased. and Miller, B. F., "Effects of sprouting on nutritional value of wheat," *Tenth National Conference on Wheat Utilization Research, Tucson, Arizona*. 1977. wherein seven days of sprouting increased the protein content by an average of 10%.

be more nutrients *relative* to the overall remaining mass, since the dry matter has decreased, so the percentage of what remains automatically increases, even if the actual quantity remains constant.

15. In other words, the apparent increases in protein and other nutrients reflect a loss of carbohydrates (dry matter) during respiration, or an alteration of the nitrogenous substances, rather than an absolute or percentage increase in protein or nutrients.[2]

16. The Products' promotion of sprouted grains is implicitly compared to non-sprouted, and whole grains – i.e., describing "sprouting" as "the only way" to release all the nutrients stored in the "whole grains," a "more efficient assimilation of protein and carbohydrates" and the "live grain difference."

17. Use of the phrases "only way," "more" and "difference" are terms of comparison and meant to demonstrate the Products' nutrient composition relative to non-sprouted grains, including whole grains.

18. The Products do not contain any reference food upon which the relative claims are based, which is misleading because there is no way to accurately evaluate the statements regarding the higher nutritional values of sprouted grains compared to non-sprouted grains.

19. The representations claim the nutrients present in the sprouted grains are of greater bioavailability ("more efficient assimilation of protein and carbohydrates").

20. The association of sprouted grains with increased bioavailability is due to its purported ability to reduce the amount of antinutrients such as phytic acid, lectins and protease

---

[2] Chavan et al., "Nutritional improvement of cereals by sprouting," Critical Reviews in Food Science & Nutrition 28.5 (1989): 401-437 (attributing the increased amounts of protein, fat, fiber, and total ash (minerals) to the disappearance of starch); see also Klaus Lorenz et al., "Cereal sprouts: composition, nutritive value, food applications." Critical Reviews in Food Science & Nutrition 13.4 (1980): 353-385 (Increases in protein due to "loss of dry weight through respiration during germination. Thus, the germinated material would contain more seeds and, therefore, more nitrogen than ungerminated samples on a unit-weight basis. In other words, the apparent increases in protein may reflect a loss of carbohydrates during respiration or an alteration of the nitrogenous substances rather than an actual increase in protein.").

inhibitors.

21. Antinutrients are believed to contribute to nutritional deficiencies in persons whose diets are centered on grains and legumes.

22. By removing the antinutrients, it is hypothesized that absorption of vitamins and minerals is increased.

23. The Products contain implied relative claims for decreased levels of antinutrients, through the statements promoting more efficient "assimilation."

24. Moreover, the quantity of antinutrients present in a relevant reference food are already "low," which renders this claim misleading.

25. The Products claim that benefits are provided because the grains are a "living food" and touts the "live grain difference."

26. This claim is misleading because by the time the sprouted grain is dried, grounded into flour and heated, any nutritional benefits which may have existed have been extinguished.

27. The Products contain misleading statements pertaining to the completeness of the proteins. ("We discovered when these six grains and legumes are sprouted and combined, an amazing thing happens. A complete protein is created that closely parallels the protein found in milk and eggs.").

28. Excluding tax, the Products cost no less than $6.99, a premium price compared to other similar products.

## Jurisdiction and Venue

29. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

30. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

31. This Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

32. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

33. A substantial part of events and omissions giving rise to the claims occurred in this District.

## Class Allegations

34. The classes consist of all consumers in the following states: <u>all</u>, <u>New York</u> who purchased any Products with actionable representations during the statutes of limitation.

35. A class action is superior to other methods for fair and efficient adjudication.

36. The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

37. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

38. Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

39. Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

40. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

41. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

42. Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

43. Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

## Parties

44. Plaintiff is a citizen of Kings County, New York.

45. Defendant is a California corporation with its principal place of business in Corona, California (Riverside County).

46. In 2016, 2017 and/or 2018, plaintiff purchased one or more of the Products for personal consumption, for no less than $6.99 per product, excluding tax, within this district and/or State.

47. Plaintiff paid this premium because prior to purchase, plaintiff saw and relied on the misleading representations.

48. Plaintiff would purchase the Products again if there were assurances that the Products' representations were no longer misleading.

## New York General Business Law ("GBL") §§ 349 & 350

49. Plaintiff incorporates by references all preceding paragraphs.

50. Defendant's representations are false, unfair, deceptive and misleading

51. Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

52. Plaintiff desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type

53. The representations and omissions were relied on by plaintiff and class members, who paid more than they would have, causing damages.

### Negligent Misrepresentation

54. Plaintiff incorporates by references all preceding paragraphs.

55. Defendant misrepresented the composition of the Products.

56. Defendant had a duty to disclose and/or provide non-deceptive labeling of the Products and knew or should have known same were false or misleading.

57. This duty is based, in part, on defendant's affirmative claim that the Products were living grains and that sprouting caused positive nutritional changes in the components of the Products, relative to non-sprouted similar products.

58. Defendant negligently misrepresented and/or negligently omitted material facts.

59. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

60. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

### Breach of Express Warranty and Implied Warranty of Merchantability

61. Plaintiff incorporates by references all preceding paragraphs.

62. Defendant manufactures and sells Products which purport to be superior to non-sprouted products.

63. The Products, by their representations as a form of whole grains, warranted to plaintiff and class members that they contained nutrients in superior amounts and types relative to non-sprouted products.

64. Defendant warranted such attributes to plaintiff and class members, when this was not truthful and was misleading.

65. Defendant owed a special duty based on its special knowledge and position in the

sprouted grain category, to represent all of the facts, instead of only those which would be viewed favorably.

66. The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

67. Plaintiff and class members relied on defendant's claims, paying more than they would have.

### Fraud

68. Plaintiff incorporates by references all preceding paragraphs.

69. Defendant's purpose was to mislead consumers who seek products with more nutrients and are purportedly capable of achieving a beneficial effect to their health and bodily function.

70. Defendant's intent was to secure economic advantage in the marketplace against competitors.

71. Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

### Unjust Enrichment

72. Plaintiff incorporates by references all preceding paragraphs.

73. Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE,** plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct such practices to comply with the law;

3. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and GBL claims;

4. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

5. Such other and further relief as the Court deems just and proper.

Dated:   January 13, 2019

                       Respectfully submitted,

                       Sheehan & Associates, P.C.
                       /s/Spencer Sheehan
                       Spencer Sheehan (SS-8533)
                       505 Northern Blvd., Suite 311
                       Great Neck, NY 11021
                       (516) 303-0552
                       spencer@spencersheehan.com

                       Levin-Epstein & Associates, P.C.
                       Joshua Levin-Epstein
                       1 Penn Plaza, Suite 2527
                       New York, NY 10119
                       (212) 792-0046
                       joshua@levinepstein.com

1:19-cv-00249
United States District Court
Eastern District of New York

Ronnie Elliott individually and on behalf of all others similarly situated

              Plaintiff

  - against -

Food For Life Baking Co., Inc.

              Defendant

## Complaint

Sheehan & Associates, P.C.
505 Northern Blvd., #311
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: January 13, 2019

                        /s/ Spencer Sheehan
                        Spencer Sheehan